UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.

PRO SERVICES, INC.,

    Plaintiff,

v.

BHS CORRUGATED – NORTH AMERICA, INC.,

    Defendant.
_____/

## VERIFIED COMPLAINT

Plaintiff, PRO SERVICES, INC., ("Pro Services" or "Plaintiff"), by and through undersigned counsel, hereby files its Verified Complaint against Defendant, BHS CORRUGATED – NORTH AMERICA, INC. ("BHS" or "Defendant"), and in support thereof, states as follows:

### INTRODUCTION

This action is brought by Pro Services against BHS for injunctive relief to terminate BHS' years-long, surreptitious campaign to pirate Pro Services' confidential business information, solicit and steal Pro Services' employees, directly compete with, and otherwise destroy Pro Services via corporate espionage. On multiple occasions during the past year, BHS—a global supplier of manufacturing equipment in the corrugated board industry—has breached restrictive covenants with Pro Services resulting in continuous, irreparable harm and millions of dollars of damages. To date, BHS' actions have caused detrimental and potentially catastrophic losses to Pro Services' business. Pro Services has no adequate remedy at law and seeks injunctive relief to halt the extensive losses and harm it has suffered and continues to suffer at the hands of BHS.

1

## PARTIES, JURISDICTION & VENUE

1. This is an action for preliminary and permanent injunctive relief.

2. BHS is an international supplier of mechanical engineering, plant engineering, lifecycle service and digital solutions for the complex requirements of the corrugated industry.

3. BHS is a German company with its domestic principal place of business in Delaware.

4. Pro Services is a small, privately held industrial contractor located in Portage, Michigan.

5. Pro Services is a citizen of Michigan for diversity of citizenship purposes.

6. Personal jurisdiction is proper in Florida pursuant to section 48.193(1)(a)(1), (7) and (9), Florida Statutes, and section 685.102(1), Florida Statutes. *See* Exhibit A.

7. Venue is appropriate in Broward County, Florida because BHS breached restrictive covenants contained in the Parties' Operating Agreement which formed an entity located in Broward County, Florida. Moreover, pursuant to section 47.051, Florida Statutes, the causes of action herein accrued in Broward County, Florida and concern contracts entered into in Broward County, Florida.

8. Moreover, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the underlying value of the litigation—i.e., the damages suffered by Pro Services as a result of BHS' breaches of the restrictive covenants within the Operating

#2760168v2-221301.0001

Agreement—far exceed $75,000.00, exclusive of interest and costs, and is between citizens of different states.[1]

9. All conditions precedent to the filing of this action have been performed, satisfied, or waived.

## FACTUAL BACKGROUND

### I. Pro Services' Business

10. Pro Services has provided skilled trades and maintenance technicians to industrial, commercial, and/or residential customers nationwide since 1987.

11. Pro Services' mission is to provide customer solutions with world-class skilled trades and maintenance technician services throughout the United States.

12. One of Pro Services' primary sources of revenue—and a particular area of its expertise—is its Full-Service Maintenance division, wherein Pro Services assembles teams of highly skilled Full-Service Maintenance Technicians to work at factories.

13. The production maintenance services industry in which Full-Service Maintenance Technicians operate is highly competitive as it exists in a limited market with a limited number of customers. Thus, Pro Services invests a substantial amount of time and resources into customer development, marketing, recruiting, training, employee classifications, and creating a competitive pricing model.

14. Pro Services staffs, recruits, and trains individuals from across the country in order to assemble teams of hard-to-find, highly skilled Full-Service Maintenance Technicians.

---

[1] Although Pro Services does not concede it has an adequate remedy at law, it has determined its damages exceed $1,000,000 as a result of BHS' violations of the non-solicit and non-compete provisions in the Operating Agreement. However, Pro Services' damages continue to rise each day BHS is not enjoined from soliciting its employees and competing with it.

15. Because of the difficulty in sourcing highly skilled Full-Service Maintenance Technicians, and the added difficulty of finding individuals willing to relocate—often to rural areas where factories are located—many companies are incapable of tapping into this market and instead hire Pro Services to fill their staffing needs.

16. Pro Services has developed a proprietary and unique method of recruiting, training and classifying its employees, which enables Pro Services to make significant profit for each employee it staffs.

17. Pro Services' reputation, course of dealing, and history with customers and employees leads to trust and confidence in Pro Services, rendering a customer more likely to continue using Pro Services for its staffing needs—rather than attempting to hire on its own. Pro Services' reputation is based upon the relationships it has painstakingly fostered with its customers and employees for nearly forty (40) years.

18. Pro Services' employee recruiting, training, goodwill, job classifications and business model are instrumental to Pro Services' success.

19. Pro Services has expended substantial amounts of time, money, and effort to develop its trade secrets and/or valuable confidential business information, including compiling detailed information regarding its customers, employees, recruiting methods, proposals and product offerings, pricing model, technician classifications, and unique training.

20. Pro Services derives independent economic value from this information remaining confidential or not readily ascertainable by proper means by others.

21. In the wrong hands, disclosure or theft of Pro Services' trade secrets and confidential business information allow competitors to unfairly compete and obtain economic value which is not otherwise available.

22. As such, Pro Services undertakes significant efforts to maintain the secrecy of its confidential information, including limiting its access to certain individuals and requiring entities who glean information about its trade secrets to sign confidentiality agreements and/or restrictive covenants.

23. Pro Services' goodwill with Full-Service Maintenance Technicians and maintenance employees is extremely important and valuable. It is incumbent that the employees Pro Services recruit for these positions develop trust and confidence in Pro Services through their interactions with the Company's personnel. This trust and confidence ensures the employees know, for example, that they will not be contacted for positions in geographic locations which are unacceptable, for positions for which they are not qualified or outside their expertise, or for positions where the compensation is simply not adequate.

24. If Pro Services' recruiting strategies, pricing models, or employee training were disclosed, it would cause irreparable harm to Pro Services in that competitors (or, potentially customers) would obtain an unfair advantage and be able to weaken and/or unfairly compete with Pro Services.

**II.     Pro Services Enters Into An Operating Agreement with BHS**

25. BHS manufactures corrugated board machines.

26. BHS also offers its customers productivity and maintenance services.

27. One of BHS' productivity and maintenance services is called M2P. This service offers BHS' customers a productivity and maintenance service that focuses on raising productivity and overall equipment effectiveness, as well as general maintenance services, to maximize output.

28. However, BHS is a German company and has historically been incapable of meeting its customers' staffing needs in the United States without the assistance of Pro Services.

29. Accordingly, BHS has requested and relied on Pro Services to find highly skilled labor to provide M2P services to BHS since approximately 2016.

30. Indeed, Pro Services has tapped into its Full-Service Maintenance Technician labor pool to provide BHS with more than one hundred (100) employees over the life of the relationship between the Parties.

31. Under this arrangement, Pro Services continues to employ its Full-Service Maintenace Technicians; however, these Pro Services employees are directed by BHS in factories where BHS provides other services on corrugated machinery.

32. Pro Services earns money from this arrangement based upon the hourly rate paid to their employees by BHS.

33. On or about February 19, 2018, Pro Services and BHS entered into an Operating Agreement to form M2P2, LLC ("M2P2"). *See* Exhibit A, at ¶ 1.1.

34. The express purpose of the M2P2 was to expand the M2P corrugated maintenance program—while using Pro Services' Full-Service Maintenance Technicians—throughout the United States. *See* Exhibit A, at ¶ 1.5.

35. The Operating Agreement also states the Parties' intent to grow the total outsource maintenance business, with Pro Services exclusively providing the labor for M2P corrugated maintenance programs. *See id.*

36. Indeed, M2P2 has no employees and never intended to have them; rather "all personnel rendering services to [M2P2] shall remain the employees of the respective Members." *See* Exhibit A, at ¶ 3.3. In other words, the Pro Services' employees working with BHS in M2P corrugated maintenance programs were to remain employees of Pro Services.

37. BHS gained knowledge of trade secrets and other Confidential Information of Pro Services after the Parties entered into the Operating Agreement, including, but not limited to, information relating to current and prospective customers; marketing strategies, pricing strategies and information; highly technical and specialized training; business strategies and models; marketplace research and analysis; national recruiting plans; and financial information relating to Pro Services' recruiting business.

38. However, BHS used its relationship with Pro Services to access and pilfer Pro Services' trade secrets and confidential business information so that it could unfairly compete with Pro Services, solicit its highly-skilled employees, and ultimately destroy Pro Services' business.

### III. The Restrictive Covenants

39. The Operating Agreement contains certain obligations which survive its termination; namely, provisions relating to the nondisclosure of Confidential Information, non-competition, and non-solicitation of employees.

40. The Operating Agreement's Confidentiality provision states:

> **Confidentiality**. No Member shall divulge to any person or entity whatsoever any information, paper, or document relating to the assets, liabilities, operations, business affairs, or any other information about the Company or any Member. The right to maintain the confidentiality of the affairs of the Company and the Members in connection with the Companys [sic] business may be enforced by any Member or by the Company itself by way of an injunction issued out of any court of competent jurisdiction, and this right shall not restrict or take the place of the Members' or the Company's rights to money damages, actual and exemplary, for a violation of the provisions of this Paragraph.

*See* Exhibit A at ¶ 12.12.

41. Additionally, the Operating Agreement contains a Non-Compete provision, which states:

> "[t]o the extent practical, during the term of the Agreement, **the Members agree not to compete against each other, and for a**

> **period commencing on the date of this Agreement and ending on the date which is thirty-six (36) months following the termination date of this Agreement.**"

*See* Exhibit A, at ¶ 6.1 (emphasis added).

42. Paragraph 6.3 contains a comprehensive non-solicit agreement which states:

> **No Solicitation or Hiring of Employees**. Except with the express written consent of the other Member, a Member will not, directly or indirectly, for a period commencing on the date of this Agreement and ending on the date which is thirty-six (36) months following the termination date of this Agreement,
>
> **a.** induce any person who is an employee, officer, independent contractor, consultant or agent of the Company or the other Member to terminate said relationship with the Company or the other Member or to engage in activities prohibited under this Agreement (for purposes of this Agreement, the term "induce" shall not be deemed to include general solicitations of employment by advertisement in trade journals or publications of general solicitation not specifically directed towards the employees of the Company or the other Member);
>
> **b.** employ or assist in employing, or otherwise associate as an active participant in business with any person who has been employed by, or who has acted as any director or officer of the Company or the other Member at any time within a period of one (1) year immediately before the commencement of such employment or association in business with a Member; or
>
> **c.** call, write, or otherwise contact any customer of the Company or the other Member or any other person to whom the Company or the other Member provided products or services at any time during the period commencing one (1) year prior to the date of this Agreement and continuing for a period of one (1) year after the term of this Agreement, for the purpose of providing products or services to such person, except that this restriction shall not prevent a Member from continuing to do business in the ordinary course with persons who were its customers on the date hereof.

*See* Exhibit A, at ¶ 6.3(a)–(c).

43. BHS also agreed that **"[a]ny Member may suffer irreparable damage in the event this Agreement is not specifically performed according to the terms of this Agreement.**

8

**Accordingly, the Members agree that all of the terms of this Agreement shall be enforceable in a court having equity jurisdiction by a decree of specific performance or by injunction or by both** . . ." *Id.* (emphasis added).

44.     Pro Services' legitimate business interests include, but are not limited to, its: (1) trade secrets; (2) valuable confidential business information; (3) substantial relationships with existing employees; (4) goodwill and reputation within Pro Services' specific geographic market area and the highly skilled technician industry in general; and (5) the investment in education and specialized training.

### IV.     BHS Breaches The Non-Solicit & Non-Compete Agreements

45.     On December 16, 2022, BHS provided notice to dissolve M2P2.

46.     The effective date of M2P2's dissolution was June 16, 2023.

47.     After providing notice, BHS made materially false statements to Pro Services about its desire to expand its relationship with Pro Services in the foreseeable future.

48.     BHS represented to Pro Services that it was going to rely upon Pro Services to provide staffing needs for hundreds of employees because BHS had plans to more than double in size over the next several years.

49.     BHS, however, never intended to expand its relationship with Pro Services; instead, BHS furtively created its own internal recruiting department in order to directly compete with Pro Services while using the Confidential Information and trade secrets it obtained from Pro Services—including recruiting practices, highly skilled training, pricing models, and employee classification methods.

50. Then, in or around August 2023, Pro Services learned that BHS tendered offer letters to more than forty (40) of Pro Services' Full-Service Maintenance Technicians for full time jobs.

51. BHS also offered these Pro Services' employees substantial sign-on bonuses to induce them to leave Pro Services and work directly for BHS if they accepted their positions quickly.

52. Although BHS ultimately rescinded these offers, BHS has continued to solicit and otherwise aid in the solicitation of Pro Services' employees.

53. In addition, BHS' internal recruiting department has continued directly competing with Pro Services in violation of the non-compete agreement since BHS improperly attempted to induce more than forty (40) Pro Services employees to leave Pro Services in August 2023.

## COUNT I – BREACH OF NON-SOLICIT
*(for Injunctive Relief against BHS)*

54. Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 53 of this Complaint.

55. Pro Services and BHS are parties to a valid and enforceable contract; namely, the Operating Agreement. *See* Exhibit. A.

56. The Operating Agreement contains certain restrictive covenants, such as non-disclosure and non-solicitation provisions, as set forth in more detail herein. *See* Exhibit A.

57. The non-solicit restrictive covenant prohibits BHS from soliciting Pro Services' employees for thirty-six (36) months following the termination of the Operating Agreement, as set forth more fully above.

58. The restraints on use, disclosure, and solicitation specified in the Operating Agreement are reasonably necessary to protect the legitimate business interests of Pro Services,

including its valuable business information, substantial relationships with specific prospective and existing customers and employees, specialized training and its customer goodwill.

59. BHS breached the Operating Agreement by using its business relationship with Pro Services to pilfer confidential information and trade secrets about the production maintenance services industry.

60. Additionally, BHS ultimately solicited Pro Services employees—who were already providing services to BHS—to work permanently for BHS and quit their jobs with Pro Services.

61. BHS exploited its business relationship with Pro Services to obtain Confidential Information relating to Pro Services' Full Maintenance Service Technicians so that it could ultimately solicit these employees to work directly for BHS.

62. BHS also violated the Operating Agreement by soliciting more than forty (40) Pro Services employees—who were employed by Pro Services at the time of the solicitation—to work for BHS in August 2023.

63. BHS also continued to solicit and/or assist others in soliciting Pro Services employees to leave their employment with Pro Services and to work elsewhere after August 2023 and through the present.

64. By virtue of the foregoing breaches, Pro Services possesses a clear legal right to relief.

65. Additionally, as a result of BHS's actions, Pro Services has suffered irreparable harm to its legitimate business interests. The violations of the restrictive covenants set forth in the Operating Agreement create a presumption of irreparable injury to Pro Services pursuant to Section 542.335(j), Florida Statutes.

66. Upon information and belief, BHS will continue to misappropriate and use Pro Services' valuable Confidential Information and/or trade secrets to solicit Pro Services' employees and customers, and will continue to unfairly compete, unless this Court enjoins such conduct.

67. Pro Services has no adequate remedy at law as money damages will not adequately compensate Pro Services for the continued loss of its Confidential Information, trade secrets and/or employees.

68. Enforcement of the Operating Agreement and the issuance of an injunction to stop BHS from using soliciting Pro Services' employees will not adversely affect public health, safety, or welfare.

69. The actual and threatened harm to Pro Services outweighs any purported harm to BHS.

70. Entry of an injunction will serve the public interest as it protects the business interests of companies and serves to enforce the Operating Agreement between Pro Services and BHS, which is an enforceable contract related to a Florida business entity.

WHEREFORE, Plaintiff respectfully requests that this Court enter a preliminary and permanent injunction against BHS for the following:

(i) enjoining BHS from committing any breach of the Operating Agreement and/or violating the terms of the Operating Agreement;

(ii) enjoining BHS from violating the non-solicit provisions of the Operating Agreement;

(iii) enjoining BHS from utilizing information obtained through the Operating Agreement and its business relationship with Pro Services to unfairly undermine Pro Services' business;

#2760168v2-221301.0001

(iv)     ordering BHS to return to Pro Services all of its files, documents, and/or any other materials in his possession, as well as to permanently destroy all hard and electronic copies in its possession, custody, or control in accordance with a designated protocol;

(v)     ordering BHS to make email accounts, Dropbox accounts, Facebook accounts, and social media accounts, relating to Pro Services or BHS, cloud storage accounts, Google drive accounts, hard drives, flash drives, and/or any other external drives available for forensic inspection to determine the full extent of the confidential information and trade secrets taken by BHS and to ensure that said information is properly deleted and/or destroyed;

(vi)     ordering BHS to immediately terminate any individuals unlawfully solicited and/or employed by BHS in violation of the Operating Agreement,;

(vii)     granting Plaintiff its attorney's fees and costs pursuant to Fla. Stat. § 542.335(1)(k); and

(viii)     granting such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF NON-COMPETE
*(for Injunctive Relief against BHS)*

71.     Plaintiff realleges and incorporates by reference the allegations of Paragraphs 1 through 53 of this Complaint.

72.     BHS entered into an enforceable operating agreement with Pro Services that prohibits BHS from competing with Pro Services for thirty-six (36) months following the termination of the Operating Agreement, as set forth more fully above.

73.     The Operating Agreement also contains a comprehensive confidentiality agreement.

13

74. The restraints on confidentiality and competition specified in the Operating Agreement are reasonably necessary to protect the legitimate business interest of Pro Services, including its valuable Confidential Information, its substantial relationships with specific existing customers, personnel, and employees, and its goodwill.

75. BHS violated the Operating Agreement by, at a minimum, using Pro Services' Confidential Information to create its own internal recruiting department which competes with Pro Services.

76. BHS' internal recruiting department sources and provides labor which BHS was incapable of adequately sourcing and providing prior to entering into the Operating Agreement with Pro Services.

77. Pro Services profited from recruiting and placing highly skilled laborers.

78. Since BHS began violating the non-compete agreement within the Operating Agreement, BHS began to profit by staffing employees.

79. BHS took advantage of its relationship with Pro Services to obtain Confidential Information on Pro Services' employees, recruiting methodologies, training programs, pay and classification models, and business practices in the United States.

80. Upon information and belief, BHS is using the Confidential Information it took from Pro Services to unfairly compete with Pro Services to directly recruit employees for staffing positions in the maintenance technology industry.

81. As a result of the actions of BHS, Pro Services has suffered irreparable harm to its legitimate business interests, including, but not limited to, loss of and harm to its:

    a. Valuable Confidential Information;

    b. Substantial relationships with existing customers, personnel and employees; and

      c.    Customer goodwill within the limited area in which Pro Services operates.

82.    Upon information and belief, Pro Services will continue to unfairly compete with Pro Services unless the Court enjoins such conduct.

83.    Pro Services has no adequate remedy at law.

84.    Enforcement of the Operating Agreement will not adversely affect public health, safety, and welfare.

85.    Moreover, the public interest supports the issuance of an injunction to protect the business interest of Pro Services.

86.    The balance of hardships weighs in favor of Pro Services, in that its legitimate business interests are being continually harmed unless the Court enjoins BHS from further harming Pro Services' business.

87.    WHEREFORE, Pro Services demands the following:

(a)    judgment in its favor and against BHS;

(b)    a permanent injunction enjoining BHS from violating the terms of the Operating Agreement;

(c)    a permanent injunction enjoining BHS from utilizing information BHS wrongfully obtained through its relationship with Pro Services to unfairly undermine Pro Services' business;

(d)    an order requiring BHS to make its e-mail accounts, cloud storage accounts and hard drives available for forensic inspection to ensure all Pro Services information was deleted;

(e)    an order barring BHS from competing with Pro Services for the period of BHS' non-compete agreement;

(f)    Pro Services' attorneys' fees and costs pursuant to Florida Statute 542.335(k); and

(g)    all other remedies equity as this Court deems just and appropriate.

#2760168v2-221301.0001

Dated: February 23, 2024

                Respectfully submitted,

                **TRIPP SCOTT, P.A.**
*Attorneys for Plaintiff*
110 Southeast Sixth Street
15th Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 525-7500
Fascimile: (954) 761-8475

By: */s/ William C. Davell*
WILLIAM C. DAVELL
Florida Bar No. 210481
wcd@trippscott.com
jam@trippscott.com
eservice@trippscott.com
JAKE S. BLUMSTEIN
Florida Bar No. 1017746
jsb@trippscott.com
sxc@trippscott.com
JONATHAN M. BORNSTEIN
Florida Bar No. 1039974
jmb@trippscott.com

## DECLARATION
## 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct.

        Josh Jelenek

By: *Joshua Jelenek*

For: PRO SERVICES, INC.

As its: President and CFO

Date: February 23, 2024